PATTERSON BELKNAP WEBB & TYLER LLP
Attorneys for Defendant Abbott Laboratories, Inc.
1133 Avenue of the Americas
New York, New York  10036
(212) 336-2000

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x
                                                                     :
KRISTIE PAGAN, ESTHER ALEXANDER,                                     :
BRIDGETT HERRERA, VELICIA MATA, and                                  :
ASHLEY SULLIVAN, individually and as parents                         :
and natural guardians of their minor children and on                 :
behalf of all others similarly situated,                             :

                                                                     :    2:10-cv-04676-ADS-WDW
                    Plaintiffs,
                                                                     :    ORAL ARGUMENT REQUESTED
             - against -
                                                                     :
ABBOTT LABORATORIES, INC.,
                                                                     :
                    Defendant.
                                                                     :
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x


**DEFENDANT ABBOTT LABORATORIES, INC.'S MEMORANDUM OF LAW IN
OPPOSITION TO PLAINTIFFS' MOTION FOR CLASS CERTIFICATION**

# TABLE OF CONTENTS

**Page**

PRELIMINARY STATEMENT ..............................................................................................1

FACTUAL BACKGROUND ..............................................................................................2

    A.    Pest Control At The Sturgis Plant ..............................................................2

    B.    Extensive Pre-Recall Product Testing Found No Insect Contamination ................3

    C.    Pre-Recall Complaint Data Did Not Provide Notice Of The Beetle Issue .............3

    D.    Abbott's Detection Of Beetles In September 2010 And Its Response ...................5

    E.    Health Consequences Of Consuming Affected Product ..........................................6

    F.    Abbott's Refund Program ........................................................................................7

    G.    Named Plaintiffs' Individual Allegations ...............................................................7

        1.    Kristie Pagan ................................................................................................7

        2.    Ashley Sullivan ...........................................................................................8

ARGUMENT ..................................................................................................................9

I.    A Class Action Against Abbott Is Prohibited By The New Hampshire Statute .................9

II.    Plaintiffs Misstate Their Class-Certification Burden.........................................................10

III.    Plaintiffs Have Not Met Their Threshold Burden Under Rule 23(a) ...............................11

    A.    Rule 23(a)(1) – Numerosity ..................................................................................11

    B.    Rule 23(a)(2) – Commonality ...............................................................................11

        1.    The Vast Majority Of The Putative Classes Suffered No Injury ...............12

        2.    The Availability Of Statutory Minimum Damages Does Not Dispense With The Requirement Of An Injury ...........................................14

        3.    Plaintiffs' Regret Over Their Purchase Is Not A Cognizable Injury ........18

        4.    "Price Inflation" Cannot Establish A Common Injury ..............................19

    C.    Rule 23(a)(3) – Typicality .....................................................................................20

    D.    Rule 23(a)(4) – Adequacy Of Representation .......................................................21

## TABLE OF CONTENTS
### (continued)

**Page**

IV.   Plaintiffs Have Not Met Their Burden Under Rule 23(b)(3)..............................................24

    A.   Predominance........................................................................................................24

    B.   Superiority.............................................................................................................27

V.   The Court Should Not Certify A Subclass Or Any "Issue Classes".................................29

CONCLUSION.........................................................................................................................30

<u>**TABLE OF AUTHORITIES**</u>

<u>**Page(s)**</u>

CASES

*Alidina v. Penton Media, Inc.*,
No. 98 Civ. 8474, 2000 WL 98025 (S.D.N.Y. Jan. 26, 2000)................................................21

*Amchem Prods., Inc. v. Windsor*,
521 U.S. 591 (1997)................................................................................................23, 24

*Anderson v. Capital One Bank*,
224 F.R.D. 444 (W.D. Wis. 2004)........................................................................29

*Anheuser-Busch, Inc. v. Caught-on-Bleu, Inc.*,
No. Civ. 02-196-JD, 2003 WL 21715330 (D.N.H. July 22, 2003)........................................16

*Auscape Int'l v. Nat'l Geographic Enters., Inc.*,
No. 02 Civ. 6441, 2003 WL 23531750 (S.D.N.Y. July 25, 2003) ...................................21, 23

*Baron v. Pfizer, Inc.*,
42 A.D.3d 627 (3d Dep't 2007) ........................................................................19

*Becksted v. Nadeau*,
155 N.H. 615 (2007) ........................................................................................15, 16

*Benner v. Becton Dickinson & Co.*,
214 F.R.D. 157 (S.D.N.Y. 2003) ....................................................................29

*Bildstein v. MasterCard Int'l, Inc.*,
329 F. Supp. 2d 410 (S.D.N.Y. 2004)............................................................18, 19

*Brandner v. Abbott Labs., Inc.*,
No. 10-3242, 2012 WL 195540 (E.D. La. Jan. 23, 2012)............................................. passim

*Briehl v. Gen. Motors Corp.*,
172 F.3d 623 (8th Cir. 1999) ........................................................................12

*Brown v. Kelly*,
609 F.3d 467 (2d Cir. 2010)........................................................................20

*by Bridge v. Phoenix Bond & Indem. Co.*,
533 U.S. 639 (2008)........................................................................................20

*Carter v. Lachance*,
146 N.H. 11 (2001) ........................................................................................16

*Castano v. Am. Tobacco Co.*,
84 F.3d 734 (5th Cir. 1996) ........................................................................29

**TABLE OF AUTHORITIES**
(continued)

Page(s)

*Charron v. Pinnacle Group N.Y. LLC*,
269 F.R.D. 221 (S.D.N.Y. 2010) ...................................................................14

*Chin v. Chrysler Corp.*,
182 F.R.D. 448 (D.N.J. 1998).........................................................................24

*Denney v. Deutsche Bank AG*,
443 F.3d 253 (2d Cir. 2006)...........................................................................14

*Dobson v. Hartford Fin. Servs. Grp.*,
342 F. App'x 706 (2d Cir. 2009) ....................................................................26

*Donini Int'l, S.P.A. v. Satec (U.S.A.), LLC*,
No. 03CIV9471, 2006 WL 695546 (S.D.N.Y. Mar. 16, 2006) .............................21

*Eisen v. Carlisle & Jacquelin*,
479 F.2d 1005 (2d Cir. 1973)..........................................................................27

*Eisen v. Carlisle & Jacquelin*,
52 F.R.D. 253 (S.D.N.Y. 1971) ......................................................................27

*FAA v. Cooper*,
132 S. Ct. 1441 (2012)....................................................................................15

*Feinstein v. Firestone Tire & Rubber Co.*,
535 F. Supp. 595 (S.D.N.Y. 1982) ............................................................23, 24

*Fisher v. Kanas*,
487 F. Supp. 2d 270 (E.D.N.Y. 2007) ............................................................19

*Forman v. Data Transfer, Inc.*,
164 F.R.D. 400 (E.D. Pa. 1995)......................................................................29

*Frank v. DaimlerChrysler Corp.*,
292 A.D.2d 118 (1st Dep't 2002) ..........................................................12, 13, 19

*Friedman-Katz v. Lindt & Sprungli (USA), Inc.*,
270 F.R.D. 150 (S.D.N.Y. 2010) ....................................................................21

*Gilroy v. Ameriquest Mortg. Co.*,
No. 07-cv-0074-JD, 2009 WL 435296 (D.N.H. Feb. 20, 2009)...........................15

*Glynn v. Impact Sci. & Tech., Inc.*,
807 F. Supp. 2d 391 (D. Md. 2011)................................................................16

## TABLE OF AUTHORITIES
### (continued)

Page(s)

*Hampshire Paper Corp. v. Highland Supply Corp.*,
No. Civ. 02-32-JD, 2002 WL 31114120 (D.N.H. Sept. 23, 2002) ....................................15, 16

*Hershenow v. Enterprise Rent-A-Car Co. of Boston, Inc.*,
840 N.E.2d 526 (Mass. 2006) .........................................................................................17

*Hillis v. Equifax Consumer Servs.*,
237 F.R.D. 491 (N.D. Ga. 2006)......................................................................................29

*In re Abbott Labs., Inc. Similac Prods. Liab. Litig.*,
763 F. Supp. 2d 1376 (J.P.M.L. 2011)...........................................................................1, 25

*In re Aqua Dots Prods. Liab. Litig.*,
654 F.3d 748 (7th Cir. 2011) ...........................................................................................23

*In re Bisphenol-A Polycarbonate Plastic Prod. Liab. Litig.*,
276 F.R.D. 336 (W.D. Mo. 2011) ....................................................................................14

*In re Bridgestone/Firestone, Inc.*,
288 F.3d 1012 (7th Cir. 2002) .........................................................................................13

*In re Canon Cameras*,
237 F.R.D. 357 (S.D.N.Y. 2006) ................................................................................13, 24

*In re ConAgra Peanut Butter Prods. Liab. Litig.*,
251 F.R.D. 689 (N.D. Ga. 2008).......................................................................................28

*In re Ford Motor Co. E-350 Van Prods. Liab. Litig.*,
03-4558, 2012 WL 379944 (D.N.J. Feb. 6, 2012) ............................................................13

*In re Fosamax Prods. Liab. Litig.*,
248 F.R.D. 389 (S.D.N.Y. 2008) ......................................................................................24

*In re Genzyme Corp.*,
09-11267, 2012 WL 1076124 (D. Mass. Mar. 30, 2012) ....................................................6

*In re Hydrogen Peroxide Antitrust Litig.*,
552 F.3d 305 (3d Cir. 2008)........................................................................................10, 20

*In re Initial Pub. Offerings Sec. Litig.*,
471 F.3d 24 (2d Cir. 2006)...............................................................................................10

*In re MTBE Prod. Liab. Litig.*,
209 F.R.D. 323 (S.D.N.Y. 2002) ......................................................................................23

### TABLE OF AUTHORITIES
### (continued)

Page(s)

*In re New Motor Vehicles Canadian Export Antitrust Litig.*,
  522 F.3d 6 (1st Cir. 2008) ................................................................20

*In re Phenylpropanolamine (PPA) Prod. Liab. Litig.*,
  214 F.R.D. 614 (W.D. Wash. 2003) ..............................................26, 28

*In re Rezulin Prods. Liab. Litig.*,
  210 F.R.D. 61 (S.D.N.Y. 2002) .......................................................24

*In re Saturn L-Series Timing Chain Prod. Liab. Litig.*,
  MDL No. 1920, 2008 WL 4866604 (D. Neb. Nov. 7, 2008) ...................24

*In re Teflon Prod. Liab. Litig.*,
  254 F.R.D. 354 (S.D. Iowa 2008) ....................................................23

*In re Zyprexa Prods. Liab. Litig.*,
  671 F. Supp. 2d 397 (E.D.N.Y. 2009) ...........................................18, 20

*Jovine v. Abbott Labs., Inc.*,
  795 F. Supp. 2d 1331 (S.D. Fla. 2011) ............................................26

*Klay v. Humana, Inc.*,
  382 F.3d 1241 (11th Cir. 2004) ......................................................18

*LaChance v. U.S. Smokeless Tobacco Co.*,
  156 N.H. 88 (2007) ....................................................................15

*Lakeview Mgmt., Inc. v. Care Realty, LLC*,
  No. 07-cv-303-SM, 2009 WL 903818 (D.N.H. Mar. 30, 2009)................16

*Leonard v. Abbott Labs., Inc.*,
  10-CV-4676, 2012 WL 764199 (E.D.N.Y. Mar. 5, 2012)..............1, 9, 15, 28

*M.D. v. Perry*,
  --- F.3d ----, 2012 WL 974878 (5th Cir. Mar. 23, 2012) .......................11

*Maguire v. Sandy Mac, Inc.*,
  145 F.R.D. 50 (D.N.J. 1992)........................................................28, 29

*Mahtani v. Wyeth*,
  No. 08-6255, 2011 WL 2609857 (D.N.J. June 30, 2011)......................24

*Maywalt v. Parker & Parsley Petroleum Co.*,
  67 F.3d 1072 (2d Cir. 1995)..........................................................22

## TABLE OF AUTHORITIES
### (continued)

Page(s)

*McLaughlin v. Am. Tobacco Co.*,
   522 F.3d 215 (2d Cir. 2008).................................................................20, 26, 27, 29

*McNair v. Synapse Group, Inc.*,
   No. 06-5072, 2009 WL 1873582 (D.N.J. June 29, 2009).......................................25

*Messner v. Northshore Univ. HealthSystem*,
   669 F.3d 802 (7th Cir. 20012) ...............................................................................14

*Meyer v. Sprint Spectrum L.P.*,
   45 Cal. 4th 634 (2009) ...........................................................................................17

*Moore v. PaineWebber, Inc.*,
   306 F.3d 1247 (2d Cir. 2002)..................................................................................25

*Myers v. Hertz Corp.*,
   624 F.3d 537 (2d Cir. 2010)....................................................................................24

*Myers-Armstrong v. Actavis Totowa, LLC*,
   No. 08-04741, 2009 WL 1082026 (N.D. Cal. Apr. 22, 2009)................................18

*Nafar v. Hollywood Tanning Sys., Inc.*,
   339 F. App'x 216 (3d Cir. 2009) .............................................................................23

*Nichols v. Gen. Motors Corp.*,
   No. 99-C-566, 1999 WL 33292839 (N.H. Super. Ct. Dec. 13, 1999) ........................13, 16, 19

*O'Neil v. Simplicity, Inc.*,
   553 F. Supp. 2d 1110 (D. Minn. 2008).....................................................................12

*O'Neil v. Simplicity, Inc.*,
   574 F.3d 501 (8th Cir. 2009) ...................................................................................13

*Oakley v. Verizon Commc'ns, Inc.*,
   09 Civ. 9175, 2012 WL 335657 (S.D.N.Y. Feb. 1, 2012)......................................10

*Oscar v. BMW of N. Am., LLC*,
   274 F.R.D. 498 (S.D.N.Y. 2011) ..............................................................19, 20, 24

*Oswego Laborers' Local 214 Pension Fund v. Marine Midland Bank, N.A.*,
   85 N.Y.2d 20 (1995) ...............................................................................................17

*Payne v. FujiFilm U.S.A., Inc.*,
   07-385, 2010 WL 2342388 (D.N.J. May 28, 2010)................................................24

## TABLE OF AUTHORITIES
### (continued)

Page(s)

*Pelman v. McDonald's Corp.*,
 272 F.R.D. 82 (S.D.N.Y. 2010) .................................................................11, 25, 29

*Pennelli v. Town of Pelham*,
 148 N.H. 365 (2002) .................................................................................9

*Ratner v. Chem. Bank N.Y. Trust Co.*,
 54 F.R.D. 412 (S.D.N.Y. 1972) .................................................................18

*Remsburg v. Docusearch, Inc.*,
 149 N.H. 148 (2003) ...............................................................................17

*Roberts v. Gen. Motors Corp.*,
 138 N.H. 532 (1994) ...............................................................................17

*Small v. Lorillard Tobacco Co.*,
 252 A.D. 2d 1 (1st Dep't 1998) .............................................................19, 23

*Small v. Lorillard Tobacco Co.*,
 94 N.Y.2d 43 (1999) ...............................................................................19

*Spagnola v. Chubb Corp.*,
 264 F.R.D. 76 (S.D.N.Y. 2010) .................................................................29

*State v. Hynes*,
 159 N.H. 187 (2009) ...........................................................................15, 16

*Statler v. Dell, Inc.*,
 775 F. Supp. 2d 474 (E.D.N.Y. 2011) .......................................................13

*Stutman v. Chem. Bank*,
 95 N.Y.2d 24 (2000) ...............................................................................17

*Szabo v. Bridgeport Machs., Inc.*,
 249 F.3d 672 (7th Cir. 2001) ...................................................................10

*Teamsters Local 448 Freight Div. Pension Fund v. Bombardier Inc.*,
 546 F.3d 196 (2d Cir. 2008) .....................................................................10

*UFCW Local 1776 v. Eli Lilly & Co.*,
 620 F.3d 121 (2d Cir. 2010) .....................................................................20

*Wal-Mart Stores, Inc. v. Dukes*,
 131 S. Ct. 2541 (2011) ...................................................................... passim

**TABLE OF AUTHORITIES**
(continued)

Page(s)

*Watkins v. Omni Life Sci., Inc.*,
    692 F. Supp. 2d 170 (D. Mass. 2010) ...................................................................19

*Webb v. Carter's Inc.*,
    272 F.R.D. 489 (C.D. Cal. 2011) .........................................................................28

*Weiner v. Snapple Beverage Corp.*,
    No. 07-8742, 2010 WL 3119452 (S.D.N.Y. Aug. 5, 2010)...................................20

*Wilson v. Toussie*,
    No. 01-CV-4568, 2008 WL 905903 (E.D.N.Y. Mar. 31, 2008)............................29


**STATUTES**

N.Y. Gen. Bus. Law § 349............................................................................ passim

N.H. Rev. Stat. § 358-A ............................................................................... passim


**OTHER AUTHORITIES**

Fed. R. Civ. P. 23........................................................................................ passim

1 McLaughlin on Class Actions § 5:58 (8th ed. 2011)............................................1, 12

2 McLaughlin on Class Actions §§ 5:55, 8:11 (8th ed. 2011)....................................20

Victor E. Schwartz & Cary Silverman, *Common-Sense Construction of Consumer
    Protection Acts*, 54 U. Kan. L. Rev. 1, 63-66 (2005) ............................................1

Defendant Abbott Laboratories, Inc. ("Abbott") respectfully submits this memorandum of law in opposition to Plaintiffs Pagan and Sullivan's motion for class certification.

## PRELIMINARY STATEMENT

Both the Judicial Panel on Multidistrict Litigation and another federal court have held Similac-recall claims inappropriate for aggregate treatment because individualized questions will predominate over common ones. *See In re Abbott Labs., Inc. Similac Prods. Liab. Litig.*, 763 F. Supp. 2d 1376, 1376-77 (J.P.M.L. 2011); *Brandner v. Abbott Labs., Inc.*, No. 10-3242, 2012 WL 195540, at *4-*5 (E.D. La. Jan. 23, 2012).  The same conclusion is compelled here.

Aware of the "wall of case law" prohibiting product-liability class actions on predominance grounds, *see* 1 McLaughlin on Class Actions § 5:58 (8th ed. 2011), Plaintiffs attempt to repackage this action – which essentially asserts a manufacturing defect and/or failure to warn – as a case about "deceptive trade practices."  This tactic fails.  *See id.* (noting courts' refusal to certify product-liability class actions disguised as consumer-fraud actions); Victor E. Schwartz & Cary Silverman, *Common-Sense Construction of Consumer Protection Acts*, 54 U. Kan. L. Rev. 1, 63-66 (2005) (criticizing attempts to "masquerade product liability claims as [consumer-fraud] claims" to "escape . . . requirements of product liability law").

It is undisputed that only a minuscule fraction of recalled Similac units may have been contaminated.  Thus, under *any* theory of liability, the vast majority of putative class members suffered no injury.  Determining which few putative class members' units were not as allegedly represented is an individualized inquiry.  In addition, as this Court has observed, a class action is unnecessary to address any economic-loss claims in light of Abbott's refund offer. *See Leonard v. Abbott Labs., Inc.*, 10-CV-4676, 2012 WL 764199, at *27 (E.D.N.Y. Mar. 5, 2012).  For these reasons and many others, Plaintiffs' motion for class certification should be denied.

## FACTUAL BACKGROUND

A.     **Pest Control At The Sturgis Plant**

A fundamental flaw in Plaintiffs' motion for class certification – and their case in general – is their attempt to conflate the observation of insects *at Abbott's Sturgis plant* with a defect *in all finished product* manufactured there.  But these are two very different things.

Since 1999, pest-control services have routinely been provided to the Sturgis plant by EcoLab, Inc.  Decl. of Matthew Painter (Exhibit to Abbott's Reply Mem. Regarding Mootness (Dkt. No. 43)) ¶ 26.  As part of these services, EcoLab placed insect traps throughout the plant. *Id.*  As Plaintiffs note, on various occasions, Ecolab observed insects, including warehouse beetles, in traps located in non-product-contact areas.  *Id.* ¶ 29.  **But neither Abbott nor EcoLab ever observed insects in product-contact areas, in the product stream itself, or in any finished product, until days before the recall.**  *Id.* ¶ 30; Dep. of Matthew Painter (Ex. A to Decl. of John D. Winter) at 35:7-13; 58:2-8.

EcoLab provided pest-control recommendations at the conclusion of each plant inspection, and Sturgis personnel heeded Ecolab's advice without exception.  Painter Decl. ¶¶ 26-28.  For example, at EcoLab's recommendation, Abbott regularly performed insecticide "fogging" at the Sturgis plant.  *Id.* ¶ 28.  Abbott relied on EcoLab's recommendation that this was "the best answer" to its pest-control needs, and that insecticide "fumigation" was not necessary.  Painter Decl. ¶¶ 28-29; Painter Dep. at 113:7-17, 142:9-25, 143:1-5, 145:5-147:16, 148:15-149:3; Dep. of Diane Beno (Winter Decl., Ex. B) at 138:21-138:24.

The United States Food and Drug Administration ("FDA") inspected the Sturgis plant, *including all EcoLab records*, on an annual basis, and never expressed any concerns regarding pest control prior to the recall.  Painter Decl. ¶ 30; Painter Dep. at 38:19-40:24; 64:23-65:23; 66:24-67:1; 127:7-18.  Before the recall, the FDA had most recently inspected the Sturgis plant

in March 2010; it found "no significant deficiencies."  Painter Decl. ¶ 32; *id.* Ex. M at 2.

**B.      Extensive Pre-Recall Product Testing Found No Insect Contamination**

At all relevant times, every batch of powdered Similac manufactured at Sturgis was subjected to a battery of quality tests while in production.  Painter Decl. ¶¶ 12-22.  Multiple samples from each batch were tested for a variety of bacteria and microorganisms, and any batches (or portions of batches) testing out of specification were destroyed.  *Id.* ¶ 12.  Samples from every batch were also subjected to sediment testing (passing the powder through a fine filter) and analytical testing (examination of nutrient content and physical properties).  *Id.* ¶ 14. *Although these tests were performed on every manufactured batch, Abbott personnel never observed any beetles or larvae in the product before September 2010.  Id. ¶¶ 14, 16.*

In addition, throughout the 2007-10 time period, Sturgis personnel randomly tested many thousands of finished units of powdered Similac by liquefying them and straining them through a 200-micron (0.008-inch) filter.  *Id.* ¶ 18.  Between January 1 and September 14, 2010, Abbott performed this filter-testing on over 30,000 finished units, and no beetles or larvae were detected.  *Id.* ¶ 19.  Over 18,000 containers were filter-tested in August 2010 alone – the month before the recall – and no beetles or larvae were detected.  *Id.* ¶¶ 20-21.

**C.      Pre-Recall Complaint Data Did Not Provide Notice Of The Beetle Issue**

Similac powder is a multi-use food product which consumers open and then store under a variety of conditions.  Accordingly, Abbott has historically received occasional insect complaints from consumers.  Abbott continually analyzes such data; if a trend is observed, an investigation is conducted to determine causes and preventative measures.  Painter Decl. ¶ 35. Between January 2007 and September 2010, the insect complaint rate for powdered Similac manufactured at Sturgis varied between *0.5 and 2.5 complaints per million units manufactured* (0.00005% – 0.00025%), which is consistent with historical levels.  *Id.* ¶¶ 38, 44.  Three trends were observed

at various points during this three-year period.

First, Abbott detected an increase from less than one to about two consumer insect complaints per million in late 2008 and early 2009. *Id.* ¶ 40; *see also* Painter Decl., Ex. A at ABT-SIM00031917. Abbott conducted an investigation in response and determined that the increase was due to a new plastic container design that did not reclose as tightly once it had first been opened. This might occasionally allow insects in a consumer's home to enter the already opened container. *Id.* ¶¶ 40-41; Dep. of Laurie Boogaard (Winter Decl., Ex. C) at 175:19-177:24. Abbott reengineered the container, and by January 2010, the insect complaint rate returned to less than one in a million, *below* its historical average. Painter Decl. ¶ 41.

Second, immediately after the May 2010 launch of a 24/7 Similac hotline, the complaint rate increased to about 2.5 per million. *Id.* ¶ 42; *see also id.*, Ex. A at ABT-SIM00031917. Abbott had expected the baseline complaint rate to rise due to the introduction of the hotline; accordingly, this did not suggest an underlying manufacturing issue. *Id.* ¶ 42.

Third, Abbott noted a seasonal variation in insect complaints, which is inconsistent with the introduction of insects at the manufacturing stage, but consistent with the entry of insects from consumer's homes into unsealed units. *Id.* ¶ 43; Boogaard Dep. at 173:14-22.

Plaintiffs make much of the "238 consumer infestation complaints" that Abbott received between January and August 2010, Pl. Mem. at 2-3; SAC ¶ 43, but they provide none of the relevant facts discussed above. Moreover, they fail to describe the content of these "infestation complaints." Most of these complaints are vague and unsubstantiated with photographs, lot numbers, or insect samples, such that Abbott's ability to investigate them was limited. Boogaard Dep. at 181:5-184:7. To the extent it could be determined, many involved containers that had been open for a day or more. *Id.* at 182:20-183:12. Some involved insects on the *outside* of the

container, or underneath the outer plastic cap but *above* the foil seal.  *Id.* at 172:17-173:9, 174:1-12, 174:25-175:12.  And some complainants explicitly stated that insects *from their own home* had entered already opened containers.  *Id.* at 174:20-24, 175:13-18.

Placed in context, these complaints – which were consistent with historical trends – gave Abbott no reason to suspect that insects were being included in finished product at the manufacturing stage.  *Id.* at 177:25-181:5, 184:9-18, 187:1-4.  In fact, in early September 2010, just weeks before the recall, an FDA official who had been investigating a consumer insect complaint concluded that "it would appear very difficult for [the insect's access to the Similac container] to occur at the plant" and that Abbott "appeared to be taking the steps necessary" to address such complaints.  Painter Decl. ¶ 50.

**D.     Abbott's Detection Of Beetles In September 2010 And Its Response**

On September 15, 2010, Abbott detected beetles in the Similac product stream for the first time while testing an unreleased batch.  Painter Decl. ¶ 22 & Ex. A thereto at 1-2.  This finding was reported to Abbott headquarters early the next day, and Abbott immediately stopped all powder production and shipment at Sturgis.  *Id.*  Abbott promptly conducted an investigation, which determined that that "a system design element (hopper vent lines and product transfer stations)" had allowed beetles "to breach the otherwise closed manufacturing system" and "enter the product stream" in one area of the Sturgis plant.  Painter Decl., Ex. A at ABT-SIM00031906.

While this was taking place, Abbott tested many additional lots of product to evaluate the extent of the potential contamination and determine the appropriate scope of its response.  *Id.* ¶¶ 23-25 & exhibits thereto.  Between September 15 and 20 (which included two weekend days), Abbott personnel filter-tested 30,486 containers from 22 separate lots of powdered Similac manufactured at Sturgis.  *Id.* ¶ 23; Ex. A thereto at 35; Ex. J thereto.  Across those 30,486 containers, a total of 49 beetles, larvae, and/or parts thereof were detected – ***a rate of only 1 per***

*625 containers tested, or 0.16%*.  *Id.* ¶ 24 & Ex. J and K thereto.

On September 20, 2010, Abbott notified the FDA of its intent to conduct a voluntary recall.  SAC ¶ 29.  Abbott publicly announced the recall two days later.  *Id.* ¶ 30.  Out of an abundance of caution, Abbott chose to recall every unit of Similac with any remaining shelf life that was manufactured in the relevant area at the Sturgis plant.  Painter Decl. ¶ 10.  Because Similac's shelf life is up to three years, the recall therefore included all such product manufactured since September 2007.  *Id.* ¶ 10.

In other words, *the three-year scope of the recall was based on the product's shelf life, rather than any suggestion that beetles were present in finished Similac units throughout this time frame.  Id.* ¶ 11.  Plaintiffs point to no evidence of warehouse beetles in finished Similac units before mid-2010, and Abbott is aware of no such evidence.  *Id.* ¶¶ 10, 30.

On October 26, 2010, the FDA publicly announced that Abbott "ha[d] worked with state and FDA officials . . . to correct the situation, and prevent its recurrence."  Winter Decl., Ex. D at 1.  Plaintiffs make much of the FDA's "Form 483" report issued four days earlier, which made several *ex post facto* criticisms of the Sturgis facility.  However, that report states on its face that it merely "lists observations" and "do[es] not represent a final Agency determination regarding [Abbott's regulatory] compliance."  Painter Decl., Ex. R at 1; *see In re Genzyme Corp.*, 09-11267, 2012 WL 1076124, at *10 (D. Mass. Mar. 30, 2012) (FDA comments in Form 483 report are mere "interim statements" and "of doubtful materiality" in fraud lawsuit).  The FDA did not criticize Abbott's handling of consumer insect complaints.  Boogaard Dep. at 188:4-14.

**E.  Health Consequences Of Consuming Affected Product**

On September 21, 2010, Abbott's Medical Safety and Surveillance director conducted a medical analysis and concluded that there was only a "remote probability" of any health consequences from ingesting warehouse beetles.  Ex. A to Painter Decl. at ABT-SIM00031929.

The FDA, too, determined that formula containing beetles "pose[d] no immediate health risk," Winter Decl., Ex. E at 1; at worst, the FDA stated, "[i]nsect pieces in the formula could irritate the gastrointestinal tract," temporarily "causing babies to have an upset stomach or refuse food," *Id.* Ex. F at 2.

In connection with this litigation, Dr. Paul E. Hyman, professor of pediatrics at Louisiana State University and Chief of Pediatric Gastroenterology at Children's Hospital of New Orleans, analyzed the health consequences of warehouse beetle consumption. *See* Expert Report of Dr. Paul E. Hyman (Winter Decl., Ex. G). In his medical opinion, "the ingestion of *Trogoderma variabile* beetles, larvae, or parts has no capability of causing *any* injury or disorder in human infants" – not even minor symptoms. *Id.* at 3 (emphasis added).

## F.    Abbott's Refund Program

As described in earlier filings, Abbott offered (and still offers) a "full refund" to all recall participants, whether their units of product actually contained beetles or not. *See* Ex. A to Abbott's Mot. for J. on the Pleadings (Dkt. No. 13) at 1; *id.* Ex. B at 1-2; *id.* Ex. E at 1; Decl. of Laurie Boogaard (Ex. B to Abbott's June 28, 2011 Letter (Dkt. No. 19)) ¶¶ 10-21. As of May 3, 2011, Abbott had refunded over $7.1 million to consumers, and another $77 million to retailers, much of which was in turn refunded to consumers at the point of purchase. *Id.* ¶¶ 20, 22.

## G.    Named Plaintiffs' Individual Allegations

### 1.    *Kristie Pagan*

Plaintiff Kristie Pagan seeks to represent the putative New York class. She alleges that "on or about September 20, 2010," she purchased one container of recalled Similac Sensitive powder formula for approximately $30.00. Pagan Interrogatory Responses (Winter Decl., Ex. H) at nos. 6, 7. Although that container was recalled, she "has no personal knowledge" whether it contained insects. *Id.* at no. 7(f); Dep. of Kristie Pagan (Winter Decl., Ex. I) at 60:10-19.

Abbott's expert food scientist tested her recalled container, which is still three-quarters full, and detected no insect matter.  Expert Report of Marvin Winston (Winter Decl., Ex. J) at 2-3.

Pagan claims that her child "suffered from diarrhea, loss of appetite, refusal to eat, gastroenteritis and colitis, severe epigastric pain and uncontrollable crying fits from approximately September 20th to September 30th, 2010."  Pagan Interrogatory Responses at no. 3.  The doctors who treated her child attributed any symptoms to "a virus," not to Similac or insects.  Pagan Notes (Winter Decl., Ex. K) at 2; Pagan Dep. at 25:2-10; 26:5-7.  Pagan does not dispute that "a virus" caused her child's symptoms, but she personally believes that Similac somehow caused her child to contract the virus.  *Id.* at 25:11-24.

According to Pagan's interrogatories, she seeks $6,611 in hospital expenses, "[p]hysician costs" of approximately $500, and other "out-of-pocket healthcare expenses" of approximately $450.00, and she does *not* claim damages for her child's pain and suffering.  Pagan Interrogatory Responses at no. 9.  At her deposition, however, Pagan testified that she only spent $240 on medical expenses; she could not explain why her interrogatories stated otherwise, and attributed those responses to "[her] lawyer."  Pagan Dep. at 47:2-52:5.  She also testified that she *is* seeking pain-and-suffering damages.  *Id.* at 52:6-53:21.

### 2.  *Ashley Sullivan*

Plaintiff Ashley Sullivan seeks to represent the putative New Hampshire class.  She alleges that she purchased Similac Sensitive powder "approximately from the end of August 2010 to September 23, 2010."  Sullivan Interrogatory Responses (Winter Decl., Ex. L) at nos. 6, 7.  She "do[es]n't know" how much she spent on Similac, Dep. of Ashley Sullivan (Winter Decl., Ex. M) at 19:2-5, and has no records of her purchases, *id.* at 45:15-46:9.  Two of her containers were recalled,  Sullivan Interrogatory Responses at no. 7(i), although she has "no personal knowledge" whether any Similac she purchased contained insects, *id.* at no. 7(f);

Sullivan Dep. at 38:1-23, 41:3-42:1.  Abbott's expert food scientist examined her Similac containers and found them virtually empty; no insect matter was observed inside.  Expert Report of Marvin Winston (Winter Decl., Ex. N) at 4.  Sullivan admits "dump[ing] [the contents of her containers] out" before they could be examined.  Sullivan Dep. at 30:8-9, 32:13-25.

Sullivan claims that her child "suffered from vomiting, gastritis, dehydration, severe epigastric pain and uncontrollable crying fits" from "August 25 to September [sic], 2010." Sullivan Interrogatory Responses at no. 3.  No health professional has attributed these symptoms to Similac or insects.  Sullivan Dep. at 114:1-25, 115:13-16.  She seeks unquantified "damages . . . for approximately 25-30 days of conscious pain and suffering" and compensation for unspecified "medical care and medication to treat [her child]." Sullivan Interrogatory Responses at no. 9; *but cf.* Sullivan Dep. at 19:20-23 ("I did not buy any medication.").  She "do[es]n't know" how much she is owed for these medical expenses.  *Id.* at 19:16-20:5.

## ARGUMENT

## I.   A Class Action Against Abbott Is Prohibited By The New Hampshire Statute

The New Hampshire Consumer Protection Act, N.H. Rev. Stat. § 358-A ("§ 358-A"), limits the circumstances under which class actions may be maintained under that statute.  *See id.* § 358-A:10-a.  As this Court has held, when such conditions are incorporated into substantive state statutes, federal courts must enforce them.  *Leonard*, 2012 WL 764199, at *10-*13.

Under § 358-A, a class action may be brought against "one or more . . . defendants *having a principal place of business within this state*." *Id.* § 358-A:10-a(I) (emphasis added). "Basic statutory construction rules" require that this italicized language "be given effect." *Pennelli v. Town of Pelham*, 148 N.H. 365, 367-68 (2002).  Abbott is not a New Hampshire corporation, nor is its principal place of business in New Hampshire.  SAC ¶ 16.  Thus, § 358-A, on its face, precludes a class action against Abbott.

## II.      Plaintiffs Misstate Their Class-Certification Burden

Relying on dated case law, Plaintiffs argue that "the criteria set forth in Rule 23 are to be liberally construed." Pl. Mem. at 6. However, as the Supreme Court recently noted, Rule 23 "does not set forth a mere pleading standard"; a plaintiff "must affirmatively demonstrate" that all of its requirements are met. *Wal-Mart Stores, Inc. v. Dukes*, 131 S. Ct. 2541, 2551 (2011); *see Oakley v. Verizon Commc'ns, Inc.*, 09 Civ. 9175, 2012 WL 335657, at *12 (S.D.N.Y. Feb. 1, 2012) (while courts "historically" favored certification, "recent decisions [of] the . . . Supreme Court" changed this). Plaintiffs must establish each Rule 23 requirement with "evidence" – i.e., "affidavits, documents, or testimony." *In re Initial Pub. Offerings Sec. Litig.* ("*IPO*"), 471 F.3d 24, 41 (2d Cir. 2006); *see also Teamsters Local 448 Freight Div. Pension Fund v. Bombardier Inc.*, 546 F.3d 196, 202-03 (2d Cir. 2008) ("preponderance of the evidence" standard applies). None of Rule 23's requirements are ever "presumed" satisfied. *Dukes*, 131 S. Ct. at 2551.

While a lawsuit's ultimate merit does not bear *directly* on the Rule 23 analysis, it is often "necess[ary]" to "touch[] [on] aspects of the merits" to decide whether certification is proper. *Dukes*, 131 S. Ct. at 2552; *see also IPO*, 471 F.3d at 41. Thus, "when [a] class action would be proper on one [factual] premise but not another," a court "has the power to test disputed premises." *In re Hydrogen Peroxide Antitrust Litig.*, 552 F.3d 305, 316 n.15 (3d Cir. 2008). "The proposition that a district judge must accept all of the complaint's allegations when deciding whether to certify a class cannot be found in Rule 23 and has nothing to recommend it." *Szabo v. Bridgeport Machs., Inc.*, 249 F.3d 672, 675 (7th Cir. 2001); *see also Dukes*, 131 S. Ct. at 2551 (court may "probe behind the pleadings").

Accordingly, the Court should disregard Plaintiffs' mere allegations and consider the *evidence* Plaintiffs have proffered. The Court will find it lacking. This cannot be attributed to the procedural posture of this lawsuit: Abbott has already produced over a million pages of

10

documents, four Abbott witnesses have been deposed, and Plaintiffs make no argument that further discovery is required.  *See* Dkt. No. 54 at 1.

## III.    Plaintiffs Have Not Met Their Threshold Burden Under Rule 23(a)

### A.    *Rule 23(a)(1) – Numerosity*

Plaintiffs declare that they "easily surpass [Rule 23(a)(1)'s] numerosity hurdle," Pl. Mem. at 9, but they cite no *evidence* as to the numerosity of the proposed classes.  *See Pelman v. McDonald's Corp.*, 272 F.R.D. 82, 99 (S.D.N.Y. 2010) (denying certification where plaintiffs argued that "sales records . . . can reveal hundreds of thousands [of] consumers within the ambit of the class," but "Plaintiffs ha[d] not presented the court with any specific evidence").

### B.    *Rule 23(a)(2) – Commonality*

Plaintiffs rely on pre-*Dukes* case law articulating the commonality test.  In *Dukes*, the Supreme Court clarified that this test is more stringent than Plaintiffs suggest:

> [The test] requir[es] . . . that "there [be] questions of law or fact common to the class." That language is easy to misread, since "[a]ny competently crafted class complaint literally raises common 'questions.'" . . . *Reciting these questions is not sufficient to obtain class certification.* Commonality requires the plaintiff to *demonstrate that the class members "have suffered the same injury."* This does not mean merely that they have all suffered a violation of the same provision of law . . . .

> [The plaintiff must show] that all [class members'] claims can productively be litigated at once. Their claims must depend upon a common contention . . . of such a nature that it is capable of classwide resolution—*which means that determination of its truth or falsity will resolve an issue that is central to the validity of each one of the claims in one stroke.*

> "What matters to class certification . . . is not the raising of common 'questions'—even in droves—but, rather the capacity of a classwide proceeding *to generate common answers apt to drive the resolution of the litigation . . . .*"

131 S. Ct. at 2551 (citations omitted) (emphasis added); *see also M.D. v. Perry*, --- F.3d ----, 2012 WL 974878, at *5-*6 (5th Cir. Mar. 23, 2012) (noting that *Dukes* "heightened the standards

11

for establishing commonality"; abrogating prior cases stating that "[t]he test . . . is not demanding" and "[t]he interests and claims of the various plaintiffs need not be identical").

Plaintiffs claim that the "common questions" in this litigation are "whether ABBOTT`S deceptive acts or practices . . . violated § 349 of the New York General Business Law [("§ 349")]"; "whether [those] practices . . . violated [§ 358-A]"; and "[w]hether [those] practices . . . caused injury/damage to ultimate consumers of the recalled Similac products." Pl. Mem. at 10. However, these are the sort of bare "recit[ations]" that *Dukes* held inadequate. Plaintiffs must affirmatively "*demonstrate* that the class members 'have suffered the same injury'" and that an issue "central to the validity" of each putative class member's claim can be "resolve[d] . . . in one stroke." They have not done so, and they cannot do so.

### 1.    The Vast Majority Of The Putative Classes Suffered No Injury

The only thing that the entire putative class has in common is the purchase of a unit of product that Abbott decided, in an abundance of caution, to recall. The purchase of a *recalled* product, without more, is not a legal injury. *See Frank v. DaimlerChrysler Corp.*, 292 A.D.2d 118, 122-23 (1st Dep't 2002); *O'Neil v. Simplicity, Inc.*, 553 F. Supp. 2d 1110, 1116 (D. Minn. 2008), *aff'd*, 574 F.3d 501 (8th Cir. 2009).

As a leading treatise notes, "[n]othing is more fundamental in a [consumer-fraud] case than the requirement that plaintiffs prove that they did not receive what was allegedly promised," and "[t]o the extent the plaintiffs received what was promised, they were not deceived . . . ." 1 McLaughlin on Class Actions § 5:58 (8th ed. 2011). Accordingly, "[i]t is well established that purchasers of an allegedly defective product have no [consumer-fraud] claim where the alleged defect has not manifested itself in the product they own." *Briehl v. Gen. Motors Corp.*, 172 F.3d 623, 628 (8th Cir. 1999). "It is not enough to allege that a product *line* contains a defect or that a product is *at risk* for manifesting [the] defect; rather, the plaintiffs must allege that *their* product

12

actually exhibited the alleged defect." *O'Neil v. Simplicity, Inc.*, 574 F.3d 501, 503 (8th Cir. 2009) (emphasis added). "The fact that the alleged defect did manifest itself and cause injury in another case, is not relevant." *Nichols v. Gen. Motors Corp.*, No. 99-C-566, 1999 WL 33292839, at *3 (N.H. Super. Ct. Dec. 13, 1999). Courts have repeatedly applied this rule to claims under §§ 349 and 358-A. *See, e.g.*, *In re Ford Motor Co. E-350 Van Prods. Liab. Litig.*, 03-4558, 2012 WL 379944, at *16-*21 (D.N.J. Feb. 6, 2012) (refusing to certify § 349 class); *In re Canon Cameras*, 237 F.R.D. 357, 360 (S.D.N.Y. 2006) (same); *Statler v. Dell, Inc.*, 775 F. Supp. 2d 474, 485 (E.D.N.Y. 2011) (dismissing § 349 claim); *Frank*, 292 A.D.2d at 121-28 (same); *Nichols*, 1999 WL 33292839, at *3 (dismissing § 358-A claim).

This rule is justified not just by precedent, but also by "[p]ublic policy concerns." *Frank*, 292 A.D.2d at 127 (observing that allowing "no injury" consumer-fraud suits would both be "manifestly unfair" to manufacturers and would unnecessarily "increase the cost of manufacturing"); *see also In re Bridgestone/Firestone, Inc.*, 288 F.3d 1012, 1016-17 & n.1 (7th Cir. 2002) (Easterbrook, J.) (noting that allowing such suits "would both overcompensate buyers as a class and induce manufacturers to spend inefficiently much to reduce the risks of defects").

As described above, Abbott's decision to recall all Similac within its expiration date was a prophylactic measure. Plaintiffs do not – and cannot – present any evidence that *all* recalled Similac units contained beetles. *Cf. Brandner*, 2012 WL 195540, at *9 (noting that FDA "issued no finding that all of the recalled units . . . contained . . . beetles" and that "a handful of customer complaints" is "not evidence of class-wide contamination"). Extensive testing found warehouse beetles or larvae in only 0.16% of units manufactured near the time of the recall, and there is no evidence that *any* finished Similac units contained warehouse beetles before mid-2010.

Accordingly, Plaintiffs cannot demonstrate that a substantial proportion of the class

suffered injury.  "The Second Circuit has cautioned against certifying overbroad classes," *Charron v. Pinnacle Group N.Y. LLC*, 269 F.R.D. 221, 228 (S.D.N.Y. 2010), i.e., classes "defined so broadly as to include a great number of members who . . . could not have been harmed by the defendant's allegedly unlawful conduct," *Messner v. Northshore Univ. HealthSystem*, 669 F.3d 802, 824 (7th Cir. 20012); *see also Denney v. Deutsche Bank AG*, 443 F.3d 253, 264 (2d Cir. 2006).  Still less can Plaintiffs show that the entire putative class suffered "*the same* injury," as *Dukes* requires.  131 S. Ct. at 2551 (emphasis added).

By characterizing this as a case about "deceptive trade practices," Plaintiffs attempt to shift focus from the issue of whether putative class members were injured to the issue of Abbott's alleged culpability.  However, a manufacturer's omission is not actionable in the abstract; it is actionable only when it causes cognizable harm to particular purchasers.  Because at most a few putative class members were even potentially impacted by the problem Abbott allegedly failed to disclose, a determination that Abbott committed a "deceptive act" in the abstract would not resolve an issue "central to the validity of *each one of the [class members'] claims*."  *Dukes*, 131 S. Ct. at 2551 (emphasis added); *see In re Bisphenol-A Polycarbonate Plastic Prod. Liab. Litig.*, 276 F.R.D. 336, 346 (W.D. Mo. 2011) ("As much as Plaintiffs describe this as a case about Defendants' marketing and failure to divulge information, the [consumer-fraud] claims Plaintiffs are asserting require proof that [class members] were somehow affected or damaged by those omissions."  (denying certification)).

### 2.     The Availability Of Statutory Minimum Damages Does Not Dispense With The Requirement Of An Injury

Plaintiffs seek to demonstrate commonality through the minimum-damage provisions of the relevant statutes.  *See* N.Y. Gen. Bus. Law § 349(h); N.H. Rev. Stat. § 358-A:10.  This fails as a matter of law.

For starters, § 358-A *does not permit the recovery of minimum damages via class action*. The portion of the statute authorizing "Private Actions," N.H. Rev. Stat. § 358-A:10, provides for minimum damages, but the subsequent section, addressing "Class Actions," authorizes a prevailing *class* of plaintiffs to recover only "*actual damages*." N.H. Rev. Stat. § 358-A:10-a (emphasis added); *see LaChance v. U.S. Smokeless Tobacco Co.*, 156 N.H. 88, 100 (2007).

Moreover, as this Court has already recognized, Section 358-A on its face affords a private right of action only to "person[s] *injured by* [the defendant's] use of any . . . practice declared unlawful . . . ." N.H. Rev. Stat. § 358-A:10 (emphasis added); *cf. id.* § 358-A:4(III)(a) (authorizing the Attorney General to bring an action in the name of the state without showing of injury); *see Leonard*, 2012 WL 764199, at *27 ("[A]ssuming the Plaintiffs *were able to prove injury*, . . . they would . . . be entitled to [minimum damages]." (emphasis added)).

While courts have construed § 358-A as "not requir[ing] a showing of *actual damages* [i.e., proven pecuniary loss] for [a private] claimant to be awarded the statutory minimum," *Becksted v. Nadeau*, 155 N.H. 615, 621 (2007) (emphasis added); *cf. FAA v. Cooper*, 132 S. Ct. 1441, 1452 (2012) (construing "actual damages" under Privacy Act as "damages for proven pecuniary loss"), courts have made clear that an injury apart from the statutory violation itself is a prerequisite to suit. *See State v. Hynes*, 159 N.H. 187, 196 (2009) (§ 358-A "confer[s] private-party standing upon only those '*injured* by another's use of any . . . practice declared unlawful'") (emphasis in original); *Gilroy v. Ameriquest Mortg. Co.*, No. 07-cv-0074-JD, 2009 WL 435296, at *5 (D.N.H. Feb. 20, 2009) (plaintiff must show that "defendants engaged in [unlawful] practices *which caused her injury*" (emphasis added)); *Hampshire Paper Corp. v. Highland Supply Corp.*, No. Civ. 02-32-JD, 2002 WL 31114120, at *4 (D.N.H. Sept. 23, 2002) ("*injury* resulting from the defendants' conduct" necessary "to demonstrate standing" (emphasis added)).

Indeed, in each decision observing that a § 358-A plaintiff need not prove "actual damages" to receive the statutory minimum, it was clear that the plaintiff had personally suffered some harm, even if not a loss of money.  *See Becksted*, 155 N.H. at 615-17 (defendant attorneys engaged in intimidation campaign against plaintiff using "excessive, misleading and false legal bills"); *Carter v. Lachance*, 146 N.H. 11, 12 (2001) (defendant landlord "shut off [plaintiff's] utilities" and "entered her apartment without permission"); *Glynn v. Impact Sci. & Tech., Inc.*, 807 F. Supp. 2d 391, 440 (D. Md. 2011) (defendant misappropriated plaintiff's trade secrets).

By contrast, courts routinely dismiss § 358-A claims by plaintiffs who were not personally harmed by the alleged statutory violation.  *See Lakeview Mgmt., Inc. v. Care Realty, LLC*, No. 07-cv-303-SM, 2009 WL 903818, at *24 (D.N.H. Mar. 30, 2009) (no claim where plaintiff "was not harmed by . . . the alleged conduct"); *Anheuser-Busch, Inc. v. Caught-on-Bleu, Inc.*, No. Civ. 02-196-JD, 2003 WL 21715330, at *6-*7 (D.N.H. July 22, 2003) ("Even if . . . [the] tactics ascribed to [defendant] . . . are of the type that would be unlawful under [§ 358-A], [plaintiff] has failed to provide any evidence that it was injured by such conduct"); *Hampshire Paper*, 2002 WL 31114120, at *4 (dismissing claim where complaint described "defendants' alleged improper conduct" but not "the resulting harm"); *Hynes*, 159 N.H. at 191-92, 196 (plaintiff who was offended by defendant's gender-discriminatory pricing, but never paid that price, could not sue); *Nichols*, 1999 WL 33292839, at *3 (purchaser could not sue where car manufacturer concealed defect that did not manifest in her own car).

The legislative history of § 358-A confirms this statutory construction.  As originally enacted, that statute authorized a private action by "[a]ny person . . . *defrauded by*" a deceptive trade practice for "*restitution* . . . [of] his total loss."  Winter Decl., Ex. O at 43 (emphasis added).  No other damages were provided.  The requirement of an injury was unmistakable.  In

16

1975, the statute was revised to authorize "exemplary damages of *up to* one hundred dollars" *at the court's discretion*, while maintaining the requirement that the plaintiff have been "damaged by" the defendant's act.  Winter Decl., Ex. T at 410 (emphasis added).  In 1981, a bill was introduced to "improve the private remedies available to consumers *injured by* unfair or deceptive trade practices" by authorizing "double or treble damages" and attorney's fees.  Winter Decl., Ex. P at 15. (emphasis added).  During the House committee hearing, an amendment was supplied providing a "minimum recovery" for the first time (in the amount of $100, immediately increased to $200).  *Id.* at 4, 7.  However, both before and after this amendment, the bill's supporters all consistently described it merely as "*increas[ing]* the amounts [already] recoverable" by plaintiffs "*injured by*" or "*damaged by*" unlawful acts.  *Id.* at 9, 11, 13, 15, 17, 19, 20 (emphasis added).  The bill, as passed, resulted in the version of § 358-A:10 on the books today (other than a subsequent increase of the minimum recovery to $1,000).  *Id.* Ex. Q at 257.

Finally, in construing §358-A, New Hampshire courts consult Massachusetts decisions, as the two states' consumer-fraud statutes are "similar."  *Remsburg v. Docusearch, Inc.*, 149 N.H. 148, 160 (2003); *Roberts v. Gen. Motors Corp.*, 138 N.H. 532, 538-39 (1994).  Massachusetts courts have held that the availability of minimum damages "does not supplant the requirement to prove causation" of an injury, but rather, "merely eliminates the need to quantify an amount of actual damages" once injury is shown.  *Hershenow v. Enterprise Rent-A-Car Co. of Boston, Inc.*, 840 N.E.2d 526, 533 n.18 (Mass. 2006); *accord Meyer v. Sprint Spectrum L.P.*, 45 Cal. 4th 634, 640-41 (2009) (same under California statute).

As for the putative New York class, it is well-settled that causation and "actual injury" are elements of any § 349 claim, despite the statute's minimum-damages provision.  *See Stutman v. Chem. Bank*, 95 N.Y.2d 24, 29 (2000); *Oswego Laborers' Local 214 Pension Fund v. Marine*

*Midland Bank, N.A.*, 85 N.Y.2d 20, 25-26 (1995).  "[T]he claimed deception cannot itself be the only injury."  *Bildstein v. MasterCard Int'l, Inc.*, 329 F. Supp. 2d 410, 415 (S.D.N.Y. 2004).

Abbott notes in passing that, even if the Court were to conclude that §§ 349 or 358-A entitles an uninjured *individual* purchaser to statutory minimum damages, it would raise serious constitutional due-process and Rule 23 superiority concerns to allow a *class* of purchasers to recover a potentially huge number of "minimum damage" awards in a single action absent any actual harm to the vast majority of the class.  *See Ratner v. Chem. Bank N.Y. Trust Co.*, 54 F.R.D. 412, 416 & n.7 (S.D.N.Y. 1972) (denying certification and noting that "recovery of the $100 minimum by each member of the class, without any participation in the lawsuit or proof of damages, would impose a penalty not intended by Congress and possibly raising constitutional problems"); *accord Klay v. Humana, Inc.*, 382 F.3d 1241, 1271 (11th Cir. 2004); *In re Zyprexa Prods. Liab. Litig.*, 671 F. Supp. 2d 397, 462-64 (E.D.N.Y. 2009).

### 3.    Plaintiffs' Regret Over Their Purchase Is Not A Cognizable Injury

Plaintiffs argue that "had [the class members] known the truth," "they would have [never] purchased SIMILAC," and instead "would have purchased [another brand of formula] . . . ."  Pl. Mem. at 5.  However, as already noted, no consumer-fraud claim will lie unless a plaintiff's *own unit of product* was defective – even if the consumer now regrets having been exposed to a risk that did not materialize.  *See Myers-Armstrong v. Actavis Totowa, LLC*, No. 08-04741, 2009 WL 1082026, at *4 (N.D. Cal. Apr. 22, 2009) (purchaser of drug that "performed as intended with no harm" may not bring consumer-fraud claim "merely because [she] would not have purchased it had . . . she known that [it] came from a plant whose quality-control had been compromised").

In fact, the New York courts have squarely held, in cases involving undisclosed risks that never materialized, that a consumer who "b[ought] a product that [she] would not have purchased, absent a manufacturer's deceptive commercial practices," but who can articulate no

other harm, has no "injury" under § 349.  *Bildstein*, 329 F. Supp. 2d at 415-16; *Oscar v. BMW of N. Am., LLC*, 274 F.R.D. 498, 512 (S.D.N.Y. 2011); *Baron v. Pfizer, Inc.*, 42 A.D.3d 627, 629 (3d Dep't 2007); *Frank*, 292 A.D.2d at 122-28.  Such a consumer's "subsequent regret about [her] purchasing decision[], while understandable, is simply not actionable." *Small v. Lorillard Tobacco Co.*, 252 A.D. 2d 1, 8 (1st Dep't 1998).  While there is comparatively little New Hampshire case law, those cases that exist are in agreement.  *See Nichols*, 1999 WL 33292839, at *3; *accord Watkins v. Omni Life Sci., Inc.*, 692 F. Supp. 2d 170, 176 (D. Mass. 2010).

In any event, this theory of injury is belied by the fact that neither Pagan nor Sullivan actually *seeks* a refund for her purchase price.  The only damages they believe they are owed are for medical expenses or pain and suffering.  *See* Pagan Interrogatory Responses at no. 9; Pagan Dep. at 108:11-21; Sullivan Interrogatory Responses at no. 9; Sullivan Dep. at 17:9-18:16.

### 4.   "Price Inflation" Cannot Establish A Common Injury

Plaintiffs may reply that all class members *overpaid* for Similac because, absent Abbott's alleged deception, Similac would have commanded a lower market price.  However, Plaintiffs do not advance this argument in their opening memorandum, which asserts only that Plaintiffs *would not have purchased Similac at all*.  Accordingly, this argument is waived.  *See Fisher v. Kanas*, 487 F. Supp. 2d 270, 278 (E.D.N.Y. 2007) (Spatt, J.), *aff'd*, 288 F. App'x 721 (2d Cir. 2008).  Nor did Sullivan and Pagan claim to seek price-inflation damages when directly asked what damages they are seeking, as discussed immediately above.

In any event, this cannot constitute an injury common to the entire class.  Paying an "inflated price" for a unit of product that *was not as represented* may be a cognizable consumer-fraud injury – for example, a purchaser of water advertised as "from a pure and pristine mountain stream," but which turned out to be tap water, "might have a claim for the higher price [he] paid . . . as a result of the misrepresentation." *Small v. Lorillard Tobacco Co.*, 94 N.Y.2d 43, 56 &

19

n.5 (1999).  But no court has suggested that a purchaser who paid for *and received* "pristine mountain stream" water – thus obtaining the full benefit of *his* bargain – could sue where bottles *purchased by others* contained tap water, on the theory that the price of the "average unit" in the product line was inflated.  Such a theory conflicts with the many cases cited above.

Moreover, courts in consumer-fraud cases have rejected the "fraud-on-the-market" theory, sometimes applied in securities cases, under which misrepresentations or omissions are *presumed* to inflate the price paid by every purchaser.  *See* 2 McLaughlin on Class Actions §§ 5:55, 8:11 (8th ed. 2011); *McLaughlin v. Am. Tobacco Co.*, 522 F.3d 215, 230 (2d Cir. 2008), *disagreed with on other grounds by Bridge v. Phoenix Bond & Indem. Co.*, 533 U.S. 639 (2008); *UFCW Local 1776 v. Eli Lilly & Co.*, 620 F.3d 121, 133-36 (2d Cir. 2010); *Zyprexa*, 671 F. Supp. 2d at 434, 442-45.  In all events, Plaintiffs have not offered a rigorous methodology for applying a price-inflation approach to these facts, which is mandatory at this stage.  *See Hydrogen Peroxide*, 552 F.3d at 325; *In re New Motor Vehicles Canadian Export Antitrust Litig.*, 522 F.3d 6, 25-26 (1st Cir. 2008); *Weiner v. Snapple Beverage Corp.*, No. 07-8742, 2010 WL 3119452, at *6-*10 (S.D.N.Y. Aug. 5, 2010); *Oscar*, 274 F.R.D. at 513.

## C.     *Rule 23(a)(3) – Typicality*

Typicality "requires that the claims or defenses of the class representatives be typical of the claims or defenses of the class members."  *Brown v. Kelly*, 609 F.3d 467, 475 (2d Cir. 2010).  Here, Plaintiffs' claims are atypical.  Neither Sullivan nor Pagan actually claims to seek purchase-price losses; instead, they desire medical expenses and/or pain-and-suffering damages that were incurred only by a minuscule fraction of putative class members.

Plaintiffs' claims are also subject to "unique defenses" that destroy typicality.  *Brown*, 609 F.3d at 480.  Pagan concedes that her child's symptoms were caused by a "virus."  Winter Decl., Ex. K at 2; Pagan Dep. at 25:2-10; 26:5-7.  In addition, the single container of recalled

Similac she claims was "contaminated" contained no insect matter.  Pagan Dep. at 60:10-19;

64:4-18; Expert Report of Marvin Winston (Winter Decl., Ex. J) at 3.  Meanwhile, Sullivan

concedes that she discarded her recalled Similac after learning of the recall, but before filing suit.

Sullivan Dep. at 30:4-8, 32:1-25.  This spoliation of evidence may significantly impair her case.

*See Donini Int'l, S.P.A. v. Satec (U.S.A.), LLC*, No. 03CIV9471, 2006 WL 695546, at *8

(S.D.N.Y. Mar. 16, 2006).

> ### D.      *Rule 23(a)(4) – Adequacy Of Representation*

A plaintiff fails the adequacy test when she is "unfamiliar with the nature of [her] role as

[a] class representative[]."  *Auscape Int'l v. Nat'l Geographic Enters., Inc.*, No. 02 Civ. 6441,

2003 WL 23531750, at *10 (S.D.N.Y. July 25, 2003); *see also Alidina v. Penton Media, Inc.*,

No. 98 Civ. 8474, 2000 WL 98025, at *1 (S.D.N.Y. Jan. 26, 2000).  Sullivan testified that she

only joined this putative class action (rather than suing individually) for her own convenience.

Sullivan Dep. at 191:19-193:5.  She answered "I don't know" when asked whether "it matter[s]

to [her] . . . whether other New Hampshire residents get any recovery from Abbott," and added

that she "hadn't really thought into it [sic]."  *Id.* at 193:6-12.  Pagan, meanwhile, believed that

she was representing only herself and "a couple of other people" listed in the caption of the

complaint, Pagan Dep. at 110:8-112:24, and that her sole substantive responsibility as a class

representative was to "[a]ttend [a single] deposition," *id.* at 112:25-113:17.

In addition, "if the representative displays a lack of credibility regarding the allegations

made," she cannot provide adequate representation.  *Auscape*, 2003 WL 23531750, at *9-*10

(representatives inadequate where they "will be subject to impeachment based on contradictions

between their deposition testimony and [other statements]"); *Friedman-Katz v. Lindt & Sprungli*

*(USA), Inc.*, 270 F.R.D. 150, 157-60 (S.D.N.Y. 2010) (same).  During Plaintiffs' depositions,

they contradicted a number of key allegations in their pleadings and interrogatory responses.

For example, while Plaintiffs alleged that their children were "diagnosed by qualified healthcare professionals as having suffered from gastroenteritis . . . as a proximate result of ingesting [recalled] Similac," First Am. Compl. ¶ 36, both Sullivan and Pagan admitted that this was not true.  Sullivan Dep. at 114:1-25, 115:13-16; Pagan Dep. at 24:18-25:10; 26:5-7, 37:15-19.  Sullivan stated in her interrogatory responses that Abbott caused her to spend money on medications for her child, but at her deposition, she admitted, "I did not buy any medication." Sullivan Dep. at 19:20-23.

Particularly troubling is Plaintiffs' response to Abbott's interrogatory asking them to identify "every [Abbott] statement or representation" they saw and relied on.  Every named Plaintiff in this action answered with a *word-for-word identical* paragraph listing various "misrepresentations" loosely attributed to "Similac's website," "Similac packaging," and unspecified "advertis[ing]" (although Pagan's contained additional language obviously added by counsel to track the Court's March 5 opinion).  *See* Collected Responses to Interrogatory no. 8 (Winter Decl., Ex. R).  When deposed, however, Sullivan conceded that she never viewed Abbott's website before the recall, Sullivan Dep. at 58:1-13, 86:1-14; that she did not remember seeing many of these statements, *id.* at 66:1-67:16; 71:1-20; 73:25-74:14, 75:8-17, 77:4-17, 79:20-25; and that her interrogatory responses were "not true," *id.* at 86:13-21.  Pagan admitted that she had not seen the statement "safe for the consumption by infants" and blamed her interrogatory responses' inaccuracy on the fact that "[she] did not write" them and that they were "prepared for [her] by counsel."  Pagan Dep. at 84:20-85:7, 87:5-91:7, 99:20-100:24, 130:1-24.

Not only is Plaintiffs' credibility irretrievably damaged, but moreover, these responses establish that they have totally abdicated their responsibilities to their lawyers.  *See Maywalt v. Parker & Parsley Petroleum Co.*, 67 F.3d 1072, 1077-78 (2d Cir. 1995) (adequacy absent where

22

plaintiffs "ha[ve] so little . . . involvement . . . that they would be unable or unwilling to protect the interests of the class against the possibly competing interests of the[ir] attorneys").  In fact, Pagan confessed that she had never even seen the complaint, Pagan Dep. at 44:20-25; *cf. Auscape*, 2003 WL 23531750, at \*10 (finding this a sign of inadequate representation), and both Plaintiffs confessed that they did not know the meaning or provenance of various terms in "their" sworn interrogatory responses.  Sullivan Dep. at 118:9-120:3; Pagan Dep. at 31:16-32:19.

 "[C]onflicts of interest between named parties and the class they seek to represent" also preclude adequate representation.  *Amchem Prods., Inc. v. Windsor*, 521 U.S. 591, 625-26 (1997).  Plaintiffs disclaim traditional products-liability theories, and perhaps traditional product-liability damages, "in an effort to improve the possibility of demonstrating commonality" – but they purchase this "cosmetic" improvement "at the price of presenting putative class members with significant risks . . . ." *Feinstein v. Firestone Tire & Rubber Co.*, 535 F. Supp. 595, 606-07 (S.D.N.Y. 1982).  Namely, *res judicata* would bar absent class members from asserting strict-liability and warranty claims, or seeking pain-and-suffering and emotional damages, in the future.  *See Nafar v. Hollywood Tanning Sys., Inc.*, 339 F. App'x 216, 124-25 (3d Cir. 2009). This creates a serious conflict of interest.  *See id.*; *In re Teflon Prod. Liab. Litig.*, 254 F.R.D. 354, 366-68 (S.D. Iowa 2008); *In re MTBE Prod. Liab. Litig.*, 209 F.R.D. 323, 339-40 (S.D.N.Y. 2002); *Feinstein*, 535 F. Supp. at 606; *Small*, 252 A.D.2d at 11.

Finally, to the extent Plaintiffs seek refunds, "[a] representative who proposes that high transaction costs (notice and attorneys' fees) be incurred at the class members' expense to obtain a refund that already is on offer is not adequately protecting the class members' interests."  *In re Aqua Dots Prods. Liab. Litig.*, 654 F.3d 748, 752 (7th Cir. 2011).

## IV.   Plaintiffs Have Not Met Their Burden Under Rule 23(b)(3)

### A.   *Predominance*

The predominance inquiry is similar to, but "far more demanding" than, the commonality inquiry. *Amchem*, 521 U.S. at 624.  It asks whether "resolution of some of the legal or factual questions that qualify each class member's case as a genuine controversy can be achieved through generalized proof, and if these particular issues are more substantial than the issues subject only to individualized proof." *Myers v. Hertz Corp.*, 624 F.3d 537, 547 (2d Cir. 2010). Where a class action would "devolve into numerous mini-trials," individual issues necessarily predominate. *Oscar*, 274 F.R.D. at 513.

"[A]ll relevant Court of Appeals and the bulk of relevant district court decisions have rejected class certification in products liability cases" on predominance grounds.  *In re Rezulin Prods. Liab. Litig.*, 210 F.R.D. 61, 65-66 (S.D.N.Y. 2002); *see also In re Fosamax Prods. Liab. Litig.*, 248 F.R.D. 389, 396 & n.7 (S.D.N.Y. 2008).  This is because "the two decisive questions of fact," injury and causation, must generally be decided "with respect to each individual . . . purchaser and each [unit of product]." *Feinstein*, 535 F. Supp. at 604-05.  Courts find lack of predominance especially clear in cases like this one, where the relevant defect manifested only occasionally.  *See, e.g.*, *Mahtani v. Wyeth*, No. 08-6255, 2011 WL 2609857, at *8 (D.N.J. June 30, 2011) (where defect rarely manifested, "it would be nearly impossible" to determine liability "without closely examining each . . . purchaser's unique circumstances"); *Payne v. FujiFilm U.S.A., Inc.*, 07-385, 2010 WL 2342388, at *6 (D.N.J. May 28, 2010) (same); *Canon*, 237 F.R.D. at 360 (same) (§ 349 action); *Chin v. Chrysler Corp.*, 182 F.R.D. 448, 455 (D.N.J. 1998) (same); *Feinstein*, 535 F. Supp. at 603 (same).

The Judicial Panel on Multidistrict Litigation (which employs a lower threshold for predominance than Rule 23 imposes, *see In re Saturn L-Series Timing Chain Prod. Liab. Litig.*,

24

MDL No. 1920, 2008 WL 4866604, at *25 n.21 (D. Neb. Nov. 7, 2008)) unanimously held that "the individual facts contained in [Similac-recall] actions will predominate over any alleged common fact questions." *Abbott Similac*, 763 F. Supp. 2d at 1376-77. Another district court noted that "the predominance requirement [could not] be met" in a Similac-recall case "because determining [whether each class member bought a contaminated unit] would entail 'a detailed examination of each litigant's case.'" *Brandner*, 2012 WL 195540, at *4.

That Plaintiffs invoke consumer-fraud statutes here makes no difference.  Even assuming Abbott committed acts that had the *potential* to deceive the entire putative class – which is not true – "a common course of conduct is not enough to show predominance, because [it] is not sufficient to establish liability of the defendant to any particular plaintiff."   *Moore v. PaineWebber, Inc.*, 306 F.3d 1247, 1255 (2d Cir. 2002); *see also Brandner*, 2012 WL 195540, at *4 (rejecting plaintiff's argument that "the extent of [Abbott's] bad conduct" was "the predominate [sic] issue").  Because §§ 349 and 358-A contain the same causation and injury elements as other product-liability claims, the claims in this suit require the same individualized analysis.  *See McNair v. Synapse Group, Inc.*, No. 06-5072, 2009 WL 1873582, at *9-*12 (D.N.J. June 29, 2009) (under consumer-fraud statutes including § 349, "[e]ven assuming . . . a common course of deceptive conduct," individualized issues of causation predominate); *Pelman*, 272 F.R.D. at 92-94 (§ 349 class action lacked predominance because "wrongfulness of the defendant's conduct" is "only half the question," and "individualized inquiries are necessary to determine whether each plaintiff suffered injury as a result of being deceived by Defendants[]").

The individualized determinations of causation and injury would be especially fact-intensive in this case.  Even if all putative class members had retained their recalled Similac, a painstaking forensic examination of each unit would be necessary.  *See* Expert Report of Marvin

Winston (Winter Decl., Ex. N) at 5 (noting that examining Plaintiffs' Similac containers was time-consuming and laborious).

For the probable majority who have *not* retained their formula, the fact-finder would first have to determine whether each putative class member purchased Similac at all – even though it is "doubt[ful] that many individuals will still have records of minor purchases such as these [over-the-counter] products dating back [three years]." *In re Phenylpropanolamine (PPA) Prod. Liab. Litig.*, 214 F.R.D. 614, 617-19 & n.5 (W.D. Wash. 2003); *see, e.g.*, Sullivan Dep. at 45:15-46:9 (Sullivan "threw out the receipts for [her] Similac as soon as [she] bought it" and lacks "any documents at all . . . that [verify her] purchase[]"). Whether each class member's Similac contained beetles would then have to be inferred circumstantially; given the common symptoms at issue, this would be a steep uphill climb for any putative class member. *See Jovine v. Abbott Labs., Inc.*, 795 F. Supp. 2d 1331, 1337 (S.D. Fla. 2011) (noting at 12(b)(6) stage that "the Court has serious doubts that Plaintiff can prove his claims" that his child's illness was caused by recalled Similac). In any event, this would be a highly individualized inquiry. *See Dobson v. Hartford Fin. Servs. Grp.*, 342 F. App'x 706, 709 (2d Cir. 2009) (claim requiring "particularized [review of] each individual's medical history" is "ill-suited for disposition via a class action"); *Brandner*, 2012 WL 195540, at *4 (same).

In addition to the above questions as to liability, the individualized nature of the damages sought is relevant. *See McLaughlin*, 522 F.3d at 231 (while individualized damages "standing alone" is no bar to certification, it is "a factor that [the Court] must consider"); *Brandner*, 2012 WL 195540, at *5 (same). In particular, the pain-and-suffering damages that Sullivan (and perhaps Pagan) seek "necessarily implicate[] the subjective differences of each plaintiff's circumstances; they are an individual, not a class-wide, remedy." *Id.* By Plaintiffs' own

admission, determination of these damages would require individualized fact-finding.  *See* Pagan Dep. at 53:4-8 ("Q: How much money do you allege that Abbott owes you for your pain and suffering?  A: Whatever a jury sees fit."); Sullivan Interrogatory Responses at no. 9 (same).

Plaintiffs' argument that "statutory damages" will eliminate the "need for individualized damages determinations" is without merit.   As noted above, § 358-A does not authorize minimum damages in class actions.   Moreover, for obvious reasons, Plaintiffs do not waive putative class members' recoveries in excess of the $50 statutory minimum under § 349, or even the $1,000 minimum under § 358-A.  *See* Pl. Mem. at 5 ("Class members, *in most instances*, will possess *average* claims of less than one thousand dollars" (emphasis added)); Pagan Interrogatory Responses at no. 9 (itemizing over $7,000 in damages); *cf.* Texas Plaintiffs' Notice of Claim (Winter Decl., Ex. S) (alleging damages ranging from $1,600 to $12,160 per plaintiff).

Plaintiffs also suggest that the Court avoid individualized damages inquiries by "estimat[ing] . . . the damage[s]" suffered by the entire putative class, then apportioning them out "without having each member . . . file an individual claim."  Pl. Mem. at 19.  However, the only decision Plaintiffs cite approving of such a procedure, *Eisen v. Carlisle & Jacquelin*, 52 F.R.D. 253 (S.D.N.Y. 1971), was reversed on that very point.  *See Eisen v. Carlisle & Jacquelin*, 479 F.2d 1005, 1008 (2d Cir. 1973), *vacated on other grounds*, 417 U.S. 156 (1974); *accord McLaughlin*, 522 F.3d at 231.  And in *Dukes*, the Supreme Court specifically rejected "Trial[s] by Formula" involving the extrapolation of "average [damage] award[s]" to an entire class "without further individualized proceedings."  131 S. Ct. at 2561.

### B.   *Superiority*

The superiority inquiry asks whether a class action "is superior to other available methods for fairly and efficiently adjudicating the controversy."  *McLaughlin*, 522 F.3d at 222.  Several circumstances preclude a finding of superiority here.

First, as the Court has observed, "[t]he wisdom of [a class action] is questionable . . . in light of the number of cases [holding that] a voluntary recall and/or refund program provide[s] a superior method of compensating the putative class members." *Leonard*, 2012 WL 764199, at *27 (citing cases); *see also Webb v. Carter's Inc.*, 272 F.R.D. 489, 505 (C.D. Cal. 2011); *In re ConAgra Peanut Butter Prods. Liab. Litig.*, 251 F.R.D. 689, 700-01 (N.D. Ga. 2008).  Plaintiffs claim, citing no evidence, that Abbott's refund program is inadequate because "only *4 percent* of the total notified SIMILAC consumers" have sought a refund directly from Abbott.  Pl. Mem. at 16; *but cf. Webb*, 272 F.R.D. at 505 (finding refund program superior even though customers sought refunds for "only a little over 0.14% of [the recalled] garments").  Plaintiffs fail to note that many additional purchasers returned their recalled units for a refund at the place of purchase, and that Abbott reimbursed retailers many millions of dollars for these indirect refunds. Boogaard Decl. ¶¶ 20-22; Boogaard Dep. at 112:23-113:12.

Second, the "likely difficulties in managing a class action" are legion.  Fed. R. Civ. P. 23(b)(3)(D).  Most obviously, "[t]he need to prove contamination on a plaintiff-by-plaintiff basis makes [a class action] distinctly unmanageable." *Brandner*, 2012 WL 195540, at *10.  The Court must also consider the potential "difficulties in notifying and verifying [the] class." *Maguire v. Sandy Mac, Inc.*, 145 F.R.D. 50, 53 (D.N.J. 1992); *PPA*, 214 F.R.D. at 617-19 & n.5. Abbott only has records of the individuals *to whom it directly mailed recall letters*; most such individuals are recipients of free samples, and thus not necessarily class members.  Boogaard Dep. at 169:11-170:13.  Abbott does not have, and cannot assemble, records of everyone who bought Similac – an over-the-counter product often purchased with cash – at retail stores in New York and New Hampshire. *Id.* at 42:16-23, 167:13-169:10.

Third, contrary to Plaintiffs' claims, individual lawsuits under §§ 349 and 358-A are *not*

the sort of "negative value" suit appropriate for class treatment.  Pl. Mem. at 16.  Because both §§ 349 and 358-A allow a prevailing *individual* plaintiff minimum damages and attorney's fees, the cost of litigation cannot exceed the recovery.  Courts often "find[] non-superiority" in cases involving statutes with these built-in incentives to litigate small claims.  *Castano v. Am. Tobacco Co.*, 84 F.3d 734, 748 (5th Cir. 1996); *see Hillis v. Equifax Consumer Servs.*, 237 F.R.D. 491, 507 (N.D. Ga. 2006); *Anderson v. Capital One Bank*, 224 F.R.D. 444, 453-54 (W.D. Wis. 2004); *Forman v. Data Transfer, Inc.*, 164 F.R.D. 400, 404 (E.D. Pa. 1995); *Maguire*, 145 F.R.D. at 53.

## V.     The Court Should Not Certify A Subclass Or Any "Issue Classes"

No workable carve-out to Plaintiffs' class definition (e.g., a class of "all consumers who purchased recalled Similac *that actually contained beetles*") is practicable here.  It is "fundamental to certification" that the court be able to "determine who is in the class . . . without having to engage in numerous fact-intensive inquiries."  *Spagnola v. Chubb Corp.*, 264 F.R.D. 76, 97 (S.D.N.Y. 2010); *Wilson v. Toussie*, No. 01-CV-4568, 2008 WL 905903, at *4-*5 (E.D.N.Y. Mar. 31, 2008).  As discussed above, determining whose Similac actually contained beetles would necessitate countless fact-intensive "mini hearing[s] on the merits."  *Id.*

Nor would it be appropriate to utilize Rule 23(c)(4) to certify any "issue classes."  First, "issue classes . . . must satisfy the criteria of Rules 23(a) and (b) with respect to the issues certified."  *Pelman*, 272 F.R.D. at 85.  Second, issue certification is proper only when it would "materially advance the litigation" *as a whole*.  *McLaughlin*, 522 F.3d at 234 ("[c]ertifying . . . the issue of defendants' scheme to defraud, would not materially advance the litigation because it would not dispose of larger issues such as . . . injury[] and damages"); *Benner v. Becton Dickinson & Co.*, 214 F.R.D. 157, 169-71 (S.D.N.Y. 2003) (rejecting issue certification as to question of negligent product design because "a voluminous number of individual trials would [still] be required" to determine causation and damages).

## <u>CONCLUSION</u>

For the reasons set forth above, Abbott respectfully requests that the Court deny Plaintiffs' motion for class certification.

May 9, 2012

/s/ John D. Winter
John D. Winter
(jwinter@pbwt.com)
PATTERSON BELKNAP WEBB & TYLER LLP
1133 Avenue of the Americas
New York, NY 10036
Telephone: 212-336-2000     Fax: 212-336-2222

*Attorneys for Defendant*